IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

WENDY W.,[1]                                    Case No. 6:18-cv-02002-AA
                                               **OPINION AND ORDER**

                   Plaintiff,

            vs.

ANDREW SAUL, Commissioner of
Social Security,

                   Defendant.
_____

AIKEN, District Judge:

        Plaintiff Wendy W. seeks judicial review of the final decision of the
Commissioner of Social Security ("Commissioner") denying plaintiff's claims for a
period of disability and disability insurance benefits.  This Court has jurisdiction
under 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons below, the Commissioner's
decision is AFFIRMED.

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name
of the non-governmental party or parties in this case. Where applicable, this opinion uses the same
designation for the non-governmental party's immediate family member.

## BACKGROUND

On January 21, 2015, plaintiff protectively applied for a period of disability and disability insurance benefits. Tr. 171. She alleged disability beginning June 21, 2013, due a herniated disc post-surgery, scoliosis, arthritis, and a tear in her right knee. Tr. 209. Plaintiff's claim was denied initially and again upon reconsideration. Tr. 100, 107. Plaintiff appeared before an Administrative Law Judge ("ALJ") at a hearing held on July 31, 2017. Tr. 35. At the hearing, plaintiff was represented by an attorney and amended her onset date to her fiftieth birthday, March 16, 2015. Tr. 49. A vocational expert ("VE") also appeared and testified at the hearing. Tr. 37. Following the hearing, the ALJ issued an unfavorable decision and the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. This action followed.

## DISABILITY ANALYSIS

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r*, 648 F.3d 721, 724 (9th Cir. 2011).

> The five-steps are: (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations? (4) Is the claimant able to

perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724–25; *see also Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four. *Bustamante*, 262 F.3d at 953. The Commissioner bears the burden of proof at step five. *Id.* at 953-54. At step five, the Commissioner must show that the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); 20 C.F.R. § 404.1560(c). If the Commissioner fails to meet this burden, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant can perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante*, 262 F.3d at 953–54.

## COMMISSIONER'S DECISION

The ALJ performed the sequential analysis, noting that plaintiff met the insured status requirements of the Social Security Act through September 30, 2020. Tr. 17. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since her amended onset date. *Id*. At step two, the ALJ found that plaintiff had one severe impairment: degenerative disc disease ("DDD"). *Id*. At step three, the ALJ found that plaintiff's impairment or combination of impairments did

not meet or medically equal the severity of one of the impairments listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  Tr. 18.

The ALJ then assessed plaintiff's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e).  The ALJ found that plaintiff retained the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), with additional limitations:

> [Plaintiff] can lift/carry 20 pounds occasionally and 10 pounds frequently, sit for 6/8 hours, and stand/walk for 6/8 hours, except the claimant can occasionally climb ladders, ropes and scaffolds; can occasionally kneel, crouch, and crawl; can frequently, but  not constantly, reach overhead with the right, dominant, upper extremity; and requires the ability to alternate between standing and sitting at will while remaining on task.

Tr. 18.

At step four, the ALJ found that plaintiff could not perform any of her past relevant work.  *Id*.  At step five, the ALJ found that based on plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that plaintiff could perform, such that plaintiff could sustain substantial gainful employment despite her impairments.  Tr. 23.  Specifically, the ALJ found that plaintiff could perform representative occupations like cashier II, electronics worker, and small products assembler.  *Id*.  As a result, the ALJ concluded that plaintiff was not disabled under the Act.  *Id*.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record.  *Batson v. Comm'r*, 359 F.3d 1190, 1193 (9th Cir. 2004).

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and internal quotation marks omitted). In reviewing the Commissioner's alleged errors, this Court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).

When the evidence before the ALJ is subject to more than one rational interpretation, courts must defer to the ALJ's conclusion. *Batson*, 359 F.3d at 1198 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)). A reviewing court, however, cannot affirm the Commissioner's decision on a ground that the agency did not invoke in making its decision. *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006). Finally, a court may not reverse an ALJ's decision on account of an error that is harmless. *Id.* at 1055–56. "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## DISCUSSION

Plaintiff asserts that the ALJ erred by improperly discounting her subjective symptom testimony and medical opinion evidence.

## I. *Subjective Symptom Testimony*

Plaintiff contends that the ALJ erred by discounting her subjective symptom testimony. When a claimant's medically documented impairments reasonably could be expected to produce some degree of the symptoms complained of, and the record

contains no affirmative evidence of malingering, the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of her symptoms. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The ALJ must make findings that are sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).

If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). When an ALJ provides several specific reasons to discount a plaintiff's testimony, the ALJ's reliance on some invalid reasons is harmless if the ALJ's remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence in the record. *Carmickle v. Comm'r*, 533 F.3d 1155, 1162–63 (9th Cir. 2008).

At the hearing, plaintiff testified about symptoms related to her back, neck, and knee impairments. Tr. 40–63.[2] Plaintiff explained that her impairments are mostly in her back and neck. Tr. 44. It began with pain on the right side of her lower

---

[2] Plaintiff also provided a Function Report in February 2014. Tr. 197–204. But the ALJ's decision focused on plaintiff's hearing testimony and her symptom reports reflected in medical records and the April 2015 Consultative Examination Report of N. Williams, M.D. Tr. 329–37. The ALJ concluded that because the report was "completed more than one year prior to the amended alleged onset date," plaintiff's "report of daily activities during the adjudicative period" as noted in Dr. Williams' report "deserves more weight." Tr. 22. Plaintiff does not challenge that aspect of the ALJ's decision.

back, where MRIs revealed a "herniated bulging disk." Tr. 45. Plaintiff testified that her doctors "wanted me to do therapy for a year which, of course, that's not going to fix it[,]" so she "had to wait a whole year and be in pain." *Id*. When she did get surgery, the initial pain resolved, but the pain moved to her left side. *Id*. Plaintiff testified that her "left side hurts most of the time now[,]" from her upper back down her leg. *Id*. Plaintiff experienced daily back pain. Tr. 47. She took prescription pain medication when her pain was "really bad" but preferred not to and would usually lay down instead. Tr. 46.

Plaintiff could not turn her head too quickly and, if she had to look down a lot, her neck would lock up. Tr. 51–52. When plaintiff turned her head too far in either direction, it would "pinch [her] whole side" and "the pain [would] go[] all the way through down . . . into [her] fingertips" causing numbness in her hands. Tr. 52. Plaintiff testified that she could only sit for "a half hour to an hour" before her back would develop a big knot where it would pinch, and she would need to stand up. Tr. 54–55. She also testified that she could not stand for very long because of her back pain. Tr. 55. Plaintiff estimated that she could sit and stand for about two hours before taking a longer break and that she spent about half of her day laying down. Tr. 57. She also estimated that she could comfortably lift ten pounds, but any more weight would cause her pain to flare up. Tr. 58.

Plaintiff testified that most days, she would eat breakfast, straighten the house up, sweep the floor, and then watch TV while resting on her back. Tr. 47. Most days, plaintiff would also alternate between laying down to give her back a break and

getting up to do housework.  Tr. 57.  Plaintiff's pain also impacted her ability to sleep, so she needed to take two or three one-to-two hour naps each day.  Tr. 59.

For the past couple months before the hearing, plaintiff could not "even walk half a block down to get the mail." Tr. 53.  She also testified that because of her pain, it was "impossible" to leave her house and she would be "bawling if [she had] to try to go anywhere." *Id*.  Plaintiff later clarified that she did drive a couple times a week to go to the grocery store. *Id*.  Sometimes on those trips, plaintiff's back would "lock[] up" when she sat, and it would take her a while to get out of her car.  Tr. 40.

In September 2016, she had to quit her part-time job at American Greetings because she could not lift heavy boxes anymore.  Tr. 43, 50.  But before then, in 2015, she experienced pain so severe that she could barely walk and got a doctor's note to excuse her from work for a couple days.  Tr. 48–49.  Plaintiff also testified that her knee had a "tear in it from bending up and down" at that job, and she was still experiencing knee pain.  Tr. 54.  Her knee would hurt when "doing lots of steps or bending," walking, and standing. *Id*.

Plaintiff's pain also caused her to stop going to concerts with friends, dancing, and taking walks, but she had been travelling with her boyfriend.  Tr. 55–56.  Plaintiff had recently traveled by plane to Nashville and New Orleans and experienced varying amounts of pain and discomfort while in transit.  Tr. 60–62.  On a few occasions, plaintiff had to give up tickets because she was in too much pain to tolerate sitting on a plane.  Tr. 63.

The ALJ found that plaintiff's medically determinable impairment could be reasonably expected to cause some of the alleged symptoms, but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. 20.

First, the ALJ reasoned that plaintiff's testimony was inconsistent with her "generally unremarkable" physical examinations. Tr. 20. The ALJ described the results of plaintiff's April 2015 consultative examination with N. Williams, M.D., in detail. Tr. 19. The ALJ found that they were "generally unremarkable, except for possible cervical radiculopathy (but Spurling's and Hoffman's tests were negative), and some knee tenderness (but nothing significant was found other than this)." *Id.* The ALJ also recounted the evaluations reported in plaintiff's treatment notes from March, April, and October 2015 and January and February 2016. Tr. 19–20. The ALJ concluded that these notes "did not reveal any significant limitations." Tr. 19–21. In sum, the ALJ found that the physical examinations conducted by Dr. Williams and plaintiff's primary care providers showed that "she has been neurologically intact [and her] gait has been normal." Tr. 20. The ALJ also noted that "there was no treatment or imaging" to support plaintiff's complaints of knee pain. Tr. 21.

Although "subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling

effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); 20 C.F.R. § 404.1529(c)(2).

Plaintiff contends that her treatment notes do reveal "significant limitations." She points to a treatment note from February 2016, which stated that plaintiff's pain "is now interfering with her ADL's and life activities." Tr. 428. However, in context, the ALJ's finding refers to limitations based on objective findings made during physical examinations of plaintiff. The note that plaintiff cites was found in the section "History of Present Illness" and was recounting plaintiff's self-report. Further, the results of examinations conducted by plaintiff's treatment providers from 2015 through 2016 support the ALJ's finding. Most exams showed that plaintiff had normal range of motion in her neck, back, upper extremities, and lower extremities; intact strength and sensation; normal neurologic function; and a normal gait despite occasional tenderness in her back and neck and occasional pain when moving them. Tr. 389, 390, 387, 382, 424, 429, 431. One note, from March 2015 reported a "mild limping on gait," Tr. 319, but the next examination, in May 2015, reported a "normal gait," Tr. 387. Finally, only one note, from October 2015, mentioned an examination for possible pain in plaintiff's lower extremities, and it reported "no pain in hips or legs with palpitation." Tr. 382. Plaintiff points out that plaintiff was treated for knee pain in June 2013. Tr. 311. But it was reasonable for the ALJ to focus on plaintiff's more recent treatment history, particularly when the treatment notes indicated that any knee pain had consistently improved over time. Accordingly, the ALJ's finding is supported by substantial evidence.

Plaintiff also argues that imaging supported her pain testimony. First, she points to neuroimaging of her cervical spine from September 2017. Tr. 29–34. This evidence was not before the ALJ. Instead, it was additional evidence that plaintiff submitted to the Appeals Council. The Appeals Council received the evidence and made it part of the record. Tr. 5. In its decision denying review, the Appeals Council found "this evidence does not show a reasonable probability that it would change the outcome of the decision." Tr. 2. Because the Appeals Council considered this new evidence in deciding whether to review the ALJ's decision, the Court must also consider this evidence in determining whether the Commissioner's decision is supported by substantial evidence. *Brewes v. Comm'r*, 682 F.3d 1157, 1163 (9th Cir. 2012).

Some aspects of this new evidence support plaintiff's disability allegations, but it does not sufficiently undermine the ALJ's determination. Andrew Kokkino, M.D., reviewed the neuroimaging and found that it revealed the presence of "severe" cervical spondylosis at C5-6, producing bilateral foraminal stenosis in addition to an osteophythic ridge with disc protrusion at C6-7. Tr. 33–34. Although those findings indicated further degeneration, Dr. Kokkino's physical examination of plaintiff, which was conducted the same day, demonstrated no additional impact on plaintiff's functioning. Plaintiff continued to have normal muscle bulk, strength, sensation, gait, coordination, and reflexes. *Compare* Tr. 31-33 *with* Tr. 20, 340–42. Plaintiff asserts that Dr. Kokkino "recommended surgery despite largely normal neurological testing," Pls. Br. at 13, but that is not entirely accurate. Dr. Kokkino reported that

"*[i]f it comes to surgery*, [I] believe this requires an anterior cervical discectomy across the C5-6 and C6-7 levels with anterior plating across T5-7." Tr. 34 (emphasis added). And he discussed the risks and benefit of that procedure with plaintiff. *Id*. But Dr. Kokkino's notes do not suggest that he endorsed surgical intervention at that time.

Plaintiff also points to imaging of her knee from 2013, almost two years before plaintiff's amended onset date, including an x-ray taken on June 3, 2013, and an MRI taken on June 21, 2013. Tr. 317, 311. Mike Milstein, M.D., a radiologist, reviewed the x-ray and assessed possible "mild" narrowing of the medial femorotibial joint compartment. Tr. 313. Darian Morray, M.D., reviewed the MRI, assessed "a degenerative type tear" of the meniscus with abnormal signal contacts, and diagnosed "[grade] 1 to 2" chondromalacia. Tr. 318. Although these images and reports might undermine the ALJ's blanket statement that there was "no imaging" to support plaintiff's complaints of knee pain, medical evidence that predates the alleged onset of disability is of limited relevance. *Carmickle*, 533 F.3d at 1165. Accordingly, this evidence is not sufficient to undermine the ALJ's determination that plaintiff's treatment record as a whole was inconsistent with plaintiff's complaints of debilitating knee pain at the hearing.

Second, the ALJ reasoned that plaintiff's treatment history did not support the "level of [her] complaints." Tr. 20. The ALJ observed that plaintiff testified that she "takes pain medication only when she has flare-ups" and that "laying down also helps her back pain." Tr. 19. The ALJ inferred that plaintiff's daily pain "must be tolerable since she takes medication only as needed." Tr. 21. "[I]f a claimant complains about

disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007).

Plaintiff argues that the ALJ erred in relying on plaintiff's limited use of medication to discount her claims of severe daily pain because plaintiff has good reasons not to take medications, but the record suggests that plaintiff could take certain medications without major side effects. Plaintiff testified that she cannot take non-steroidal anti-inflammatory drugs because she has only one kidney, but her condition does not appear to prevent her from using all over-the-counter pain treatments. In fact, she testified that she could and did take Tylenol for her pain. Tr. 58. Plaintiff has also been prescribed medications, including Percocet, Tr. 428, Gabapentin, Tr. 426, and Tramadol, *id.*, to manage her pain, but she testified that she prefers to lie down when experiencing severe pain because she does not like how they make her feel. Tr. 46. At the hearing, she testified that they made her sleepy or sick. *Id.* Plaintiff noted that she could take Percocet without getting sick, *id.*, though a treatment note from February 2016 indicates that plaintiff avoided taking Percocet because it "makes her feel uncomfortable[,]" Tr. 424. An ALJ may permissibly infer that a plaintiff's pain was not as disabling as they claimed from the fact that the plaintiff did not seek an alternative treatment after stopping an effective medication due to mild side effects. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).

As the ALJ also noted, physical therapy helped with plaintiff's pain when she attended it in late 2015, but she failed to follow up with physical therapy in 2016 because she had been travelling with her boyfriend. Tr. 20. Plaintiff's favorable response to a "conservative treatment" like physical therapy, coupled with plaintiff's failure to follow through with that treatment despite a favorable response, also undermines plaintiff's testimony regarding the disabling nature of her pain. *Tommasetti*, 533 F.3d at 1040.

Finally, the ALJ reasoned that plaintiff's reported activities were inconsistent with her alleged limitations. Specifically, the ALJ observed that plaintiff "is able to travel frequently despite the physical demands[,]" Tr. 20, and that her reported "daily activities are quite involved[,]" Tr. 21. An ALJ may use a claimant's daily activities to discount symptom testimony if the activities "contradict [the claimant's] other testimony." *Orn*, 495 F.3d at 639.

The ALJ provided a thorough explanation of the ways that plaintiff's air travel and testimony about her travel experiences contradicted her testimony about her pain, her sitting, standing, and walking limitations, and her need for daily naps. The ALJ reasoned:

> [Plaintiff] testified that she is able to travel by airplane with her boyfriend to places like Nashville, TN and New Orleans, LA. To get to these locations, it would take hours of sitting at airports and in airplanes, which conflicts with her testimony regarding how long she can sit. Travel also indicates that she is standing and walking for longer times and distances than alleged, as airports have large spaces often requiring substantial walking, and travelling usually requires waiting in lines. She testified that her boyfriend handles her luggage, but treatment notes reflected she was pulling a suitcase. . . . This information also challenges her claim that she needs to nap every day.

> While she claims that traveling is very difficult and "awful," she said she
> still does it, suggesting it is more tolerable than described in her
> testimony.

Tr. 21. Although plaintiff's testimony indicates that she may have used a wheelchair once while travelling—she commented that, on her first trip, she "cried a lot" and was "ready for the wheelchair," *see* Tr. 61—that accommodation does not undermine the majority of the ALJ's analysis and provides further support for the ALJ's reasoning related to plaintiff's ability to tolerate sitting for long periods of time. Plaintiff also testified that she had given up some plane tickets because she was in too much pain to travel. Tr. 63. At the same time, the record shows that plaintiff did manage to make three long-distance plane trips to Las Vegas, Nashville, and New Orleans in 2016. Tr. 61, 378, 424. Here, the ALJ's interpretation of plaintiff's testimony may not be the only reasonable one, but it is still a reasonable interpretation supported by substantial evidence that is entitled to deference. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

The ALJ also found plaintiff's "daily activities are quite involved[,]" noting that plaintiff reported "being able to handle her own personal care, cook, do chores such as laundry (twice per week), dust (once per week), vacuum (three times per week), and grocery shop (twice per week), walk up to two miles, drive, and shop for clothes at the mall and have lunch with friends." Tr. 21. The ALJ reasoned that the nature and frequency of the activities "suggest a level of functioning greater than what [plaintiff] has alleged in her application and testimony." *Id*.

Plaintiff contends that her activities are not "quite involved" and asserts that her ability to walk two miles when she is not in pain does not demonstrate that plaintiff is able to work more than part-time or stand for more than four hours in a day. Pl's. Br. at 15.

"ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014). "[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Id*. But even if the ALJ erred in relying on plaintiff's self-care, housework, and occasional ability to walk two miles, that error was harmless because the ALJ provided several other valid reasons to discount plaintiff's symptom testimony. *Batson*, 359 F.3d at 1197.

## II.    *Medical Opinion Evidence*

Plaintiff also challenges the ALJ's weighting of the opinions from Physician's Assistant Lisa Moeller and Scott Johnson, M.D. PA Moeller was plaintiff's primary care provider and had treated plaintiff at Oregon Medical Group since December 2011. PA Moeller and Dr. Johnson, another provider at Oregon Medical Group, submitted a joint "Spine Medical Sources Statement" on September 8, 2016. Tr. 348–51.

In the statement, PA Moeller and Dr. Johnson diagnosed "hip pain, back pain, neck pain." Tr. 348. They reported that plaintiff's symptoms included "pain, decreased movement and function, fatigue and anxiety due to chronic pain." *Id*. PA Moeller and Dr. Johnson opined that plaintiff could walk up to half a block without rest or severe pain; could tolerate sitting for ten minutes at a time, standing for five minutes at a time, sitting for less than two hours in an eight-hour day, and standing and walking for less than two hours in an eight-hour day. Tr. 349. They also opined that plaintiff could not work a full eight-hour day and needed a job that allowed shifting at will from sitting to standing or walking, four-to-five minute walks every ten-to-fifteen minutes, and unscheduled breaks every thirty-to-forty-five minutes. Tr. 349–50. Finally, they opined that plaintiff was limited to lifting ten pounds rarely; rarely crouching, squatting, and climbing stairs; never twisting, stooping, or climbing ladders; reaching in front of her body and overhead 50% of the time; and that plaintiff would likely be "off task" 25% or more of the day. Tr. 350–51.

Social security law recognizes three types of medical sources: (1) treating, (2) examining, and (3) non-examining. *Garrison*, 759 F.3d at 1012. An "ALJ must explicitly reject medical opinion, or set forth specific, legitimate reasons for crediting one medical opinion over another." *Id*. Because PA Moeller and Dr. Johnson are treating sources, their opinions are generally entitled to more weight than those given by doctors who did not treat plaintiff. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). But, because their opinions were contradicted by examining physician Dr. Williams, Tr. 334–35, and non-examining consulting physicians Susan Moner, M.D.,

Page 17 – OPINION AND ORDER

Tr. 79–86, and Mary Ann Westfall, M.D., Tr. 94–95, they were not entitled to controlling weight, and the ALJ could validly discount them by providing "specific and legitimate reasons" that were supported by substantial evidence in the record. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [their] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Here, the ALJ gave PA Moeller and Dr. Johnson's opinions "little weight" and expressly credited Dr. Williams' April 2015 opinions over theirs. Tr. 22. The ALJ reasoned that plaintiff's treatment records from 2015 and 2016 "showed only a minimal physical examination was conducted in order to support their opinion[,]" while Dr. Williams "conducted an extensive physical examination to support his opinion." *Id*. The found no evidence of a "significant worsening" in plaintiff's condition since Dr. Williams' exam. *Id*. The ALJ also found plaintiff's treatment provider's opinion that plaintiff was completely debilitated in September 2016 was inconsistent with the lack of any "recent treatment for these supposedly disabling impairments" and plaintiff's ability to travel earlier that year. Tr. 22.

The ALJ did not commit harmful legal error when evaluating PA Moeller and Dr. Johnson's joint opinions. The ALJ's decision to credit Dr. Williams' opinion over plaintiff's treating provider because his April 2015 exam was more extensive than the several exams PA Moeller conducted during the relevant period fails to fully account for the length and nature of PA Moeller and plaintiff's treating relationship. But any

error in relying on this reason was harmless because the ALJ provided several specific and legitimate reasons to reject their opinions. *Molina*, 674 F.3d at 1115.

Inconsistency between a treating provider's opinion and a claimant's activities may constitute a specific and legitimate reason to discount that opinion. *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014). As discussed above, the ALJ reasonably explained how plaintiff's long-distance air travel was inconsistent with extreme limitations in sitting, standing, and walking and the need for multiple daily naps, specifically, and debilitating symptoms, generally. Although plaintiff did not engage in that kind of travel daily, it was reasonable for the ALJ to find that the inconsistencies undermined her treatment providers' opinions when she had done some of that traveling in the six month period between her last treatment visit to Oregon Medical Group and the date of PA Moeller and Dr. Johnson's report.

Similarly, the ALJ could validly infer that plaintiff's gap in treatment was inconsistent with PA Moeller and Dr. Johnson's report of severe, debilitating pain and extreme physical limitations when there was no other apparent reason for plaintiff's lack of treatment. *See Ghanim*, 763 F.3d at 1161 (including frequency of examination in the factors that the ALJ may consider in weighting a treating physician's opinion); *Blacksher v. Berryhill*, 762 Fed. App'x 372, 375 (9th Cir. 2019) (concluding that the ALJ properly relied on plaintiff's gaps in treatment with his mental health provider to discount the provider's opinions); *Green v. Berryhill*, 731 Fed. App'x 596, 598 (9th Cir. 2018) (concluding that the ALJ provided specific and legitimate reasons to reject a treating physician's opinion when the ALJ reasoned

Page 19 – OPINION AND ORDER

that "a gap in treatment was inconsistent with the alleged severity of Green's limitations").

In sum, the ALJ's decision is supported by substantial evidence in the record and free of harmful legal error.

## CONCLUSION

The Commissioner's decision is AFFIRMED, and this case is DISMISSED.

IT IS SO ORDERED.

Dated this <u>29th</u> day of May 2020.


_____/s/Ann Aiken_____

Ann Aiken
United States District Judge

Page 20 – OPINION AND ORDER